The United States Court of Appeals for the Ninth Circuit is now in session. Good morning. I'm Judge Gould and I'm presiding today. Delighted to be sitting with my colleagues Judge Tallman on my right and Judge Christens on my left. Now, we have several cases for argument today, but before we start with arguments, let me note for the record the cases submitted on briefs. First, we have David Osorio-Cion v. Bondi that's submitted on briefs. We have Marie Nadon v. Pizzignano, submitted on briefs. We have U.S. v. We'll start with the first case being argued, which is Taylor Chairs v. City of Seattle, and that's set for 15 minutes per side. So, appellant can start us off, please. Judge Gould, and may it please the Court, my name is Jake Wilson. I'm here representing the plaintiff, Taylor Chairs, in this matter. I'd like to point out at the outset that Mr. Chairs is with us in the courtroom today, and I would like to reserve five minutes of my time for rebuttal. Okay. So, I'll try to remind you if you forget, but try to watch out for your clock and just stop before all the time's gone. Thank you, Your Honor. I will do that. I think we get a yellow light when the time is up. Oh, yeah. Right, you'll get a yellow and then a red. You'd be amazed at how colorblind counsel are. Also, in the heat of your argument, you may get questions from my colleagues or me, and you of course should answer fully any questions, and if we take up too much of your time, I'm sure I can give you an extra minute or two. I appreciate that, Your Honor. Okay, so please proceed. Okay. So, I just want to start with this comment. I think that the fundamental error that permeates the decision below is that the trial court really did not properly apply the summary judgment standard in this case. I think that there's a failure to draw inferences in favor of Mr. Chairs, and I think there was a failure to view the facts in the light most favorable to Mr. Chairs, and in fact, I would suggest that the court sort of did the opposite. It seems like it drew inferences in favor of the city and viewed the facts in the light most favorable to the city, and all the specific points I'm going to make, I think, fall under that umbrella, so I wanted to start with that. Counselor, I'm sure you're going to address this, but the concern that I have with the Fourth Amendment claim here is whether or not the act of using dispersal munitions in order to curb a riot constitutes a seizure within the meaning of the Fourth Amendment when the intent, as I understand it, from the incident commander's orders were to disperse the crowd. Thanks for the question. Obviously, there is a boundary beyond which a police use of even of dispersants, as you refer to them. I would refer to this as an explosive military style munition. I mean, you can characterize it however you want, but the legal issue is what's troubling me, and he wasn't trying to arrest him. He was trying to get him out of the area. We don't look at his subjective intent. We're not suggesting that, and we understand that it's less than lethal, but I think Judge Tallman's question is going to be the question that we all have. Sure. Why was that a seizure? Let me just say, I understand that the device was intended to stop the movement of the person. At least that's what you argue, that that is a seizure. Well, a use of force causing injury under Ninth Circuit case law is in general terms considered a seizure. So, the police don't need to arrest- Not after Sanderlin. It's a much more nuanced analysis, right? It's a much more nuanced analysis, and we're not going to decide an objective intent to restrain is what we're looking for, right, after Torres and then Sanderlin, but that's not going to be judged by what happens on the back end. I think that's really critical here, isn't it? Well, I do understand the purpose of the question and the legal issue, and it does go to the You know, it feeds into the Puente case, which they submitted as supplemental authority in January, and it's one of the things I wanted to address because it wasn't addressed in the briefing. In that case, and I hope you will look at it carefully, there was a finding as to the individual plaintiff named Guillen, who was one of the three individual plaintiffs, and even in that circumstance, which I would say it was less serious of an injury than here, the court found that there was a triable issue of fact- How can it judge it based upon ... You seem to be inviting us to look at the back end, the injury, how serious the injury was. We're looking, right, on the front end, what was the intent to restrain? Well, I think that on the front end, what you can please consider is that the officer who deployed this grenade had no idea what he was doing with it. He had no idea who he was aiming it at. He had no idea whether he had hit anyone, and so- Counsel, wasn't he responding to a direct order from the captain who served as the incident commander to deploy these devices in order to disperse the crowd? There certainly were command instructions. And then followed by public address announcements to the crowd to disperse, or they would be to arrest under Washington law for failing to disperse. I mean, that's why I'm a little bit hung up on whether or not we have a seizure here, because the intent here is to get people out of the area to disperse. That's the whole intent of the law. And as Judge Christen pointed out, it doesn't really matter what the subjective intent of the grenadier is who threw the device. It's what he was trying to do. I think the logic there is a little bit concerning in that that would sort of- Are you quarreling with me or the Supreme Court? Because that's what I understand the Supreme Court law to be. I guess I'm really quarreling with the SPD and how they've characterized the case. But it is certainly true that there were dispersal orders given, but when an officer is deploying these serious munitions, which are very foreseeable to cause significant injury- Okay, but you keep sliding into the excessive force, and that's step two. We've got to get past step one, which is, was this done with regard to an intent to restrain or to disperse? I submit to you that when you are deploying very dangerous munitions like this, which are very foreseeable to cause harm, that is an intent to restrain because it is very foreseeable you're going to injure- What's your best case authority to support that argument? Well, I would point you again to the Puente case, which they submitted to you, and then the holding as to Guillen. I think it's very similar to this case. Why aren't we looking at Sanderlin, which is more recent? The district court didn't have the benefit of Sanderlin. But Torres is, of course, the case that we're building on, and then much more recently, Sanderlin. Our court there talked about that particular device being designed to incapacitate. We have this blast ball that he was using in this case under the circumstances that Judge Tallman has described. He deployed it overhead, and that's not favored pursuant to the policy. What troubles me about this case is he did this very same thing four times. On one instance, he deployed it overhead, and it had inflicted a very serious injury on a person, right, because of here in the chest, and she had a serious cardiac incident. I think he did, objectively, the same thing on this occasion a minute or two later, and the result on the back end was quite different, right? It landed on the ground between the two. Now, this type of munition that is basically a grenade, and it disperses a chemical irritant, landing between the police and the crowd, that's consistent with trying to push the crowd back, right? But again, I think the law tells us we don't look at the result on the back end. The same action, the same objective action, lobbing overhead, had it landed in the middle of that crowd, it would actually have the effect of pushing the crowd forward. So it's tough to judge the intent, objective intent to restrain, based upon what happens on the back end. You see what's troubling me, and this seems to be the perfect case to tease out what we mean by that. I understand the question. Thank you. I don't think that the officer's subjective statement about what his intent was is dispositive on a summary judgment standard. I'd like to have him on the stand at trial. Well, the subjective, certainly in this case, we're not looking at his subjective intent, right? We're looking at objectively. The officer and the SPD have submitted, made statements to this court about what their intent was. I would submit to you that as a matter of summary judgment law on use of force, that when a police officer essentially deploys dangerous munitions recklessly, that it demonstrates an intent to restrain. It demonstrates at least a reckless disregard for whether or not this munition that I'm deploying, and remember, without being able to see where he was deploying it, without seeing whether he struck anybody, without knowing that he had actually seriously injured two people, that is an intent to restrain. Well, what you're doing now, I think, is you're abandoning the question you're invited to discuss, which is, was there a seizure? I think you're now, and I think that's, in this case, I think it's actually a very difficult question posed to Sanderlin, for the reasons I just mentioned. It's the very same objective action that the officer took on two occasions, and I think the internal incident report indicates that one of those was deemed to be excessive. But setting that aside, now I think you're inviting us to talk about whether or not this was an unreasonable use of force, given the circumstances of this crowd that was a very hostile crowd. What's your best shot on that? You know, we rely heavily on the Nelson case. I think that's a very similar case. Because Nelson did not involve the same set of facts. I mean, the officers were taking incoming projectiles of varying degree of severity, including up to and including incendiary devices. They'd been on riot duty for how many hours over how many days? I mean, that all has to be considered in the mix, does it not, under the Supreme Court's teachings? Well, I think it is rightly considered. But I think that even when, you know, the circumstances are difficult, the police still have a responsibility to deploy force in a reasonable manner. Which depends upon the nature of the force that they're facing. And my question to you is that we don't look at it in isolation. In other words, just this officer. I mean, we've got, what, maybe 200 police officers facing off against 9,000 protesters. If you've ever been in that kind of a situation, this is a classic example of circumstances that are tense, uncertain, and rapidly evolving. And if I understand your argument correctly, you want us to say as a matter of qualified immunity law, police officers could never get qualified immunity because they use this particular munition. And therefore, that's a jury question and cannot be resolved on summary judgment. And as my colleague, Judge Christin, points out, I think the law is a lot more nuanced than that. I really want to remind the court that this isn't a qualified immunity case. And so we don't have any claims against the individual officers. It is a 1983 action, though, which alleges a constitutional violation, which gets back to my question that I asked at the very outset, which is, do we have a restraint or dispersal here? Is it a seizure under the Fourth Amendment in order to establish the constitutional violation for 1983? And I submit to you that when the police deploy a weapon and cause a serious injury, putting aside whether it was a reasonable use of force for a second, that's a seizure. A party that is struck by an exploding munition, who is doing nothing wrong himself. How do you reconcile that with TORUS? We're looking for an objective intent to restrain. And what you're telling is, if somebody gets seriously hurt, then after the fact, we should deem that to have been an intentional intent to restrain. I'm sorry if it seems circular. But if an officer uses force in a reckless, irresponsible way, which, by the way, the SPD found that this officer had done, I'm sorry, Your Honor. That characterization, reckless, irresponsible, and I acknowledge the earlier incident report, which I find certainly gives me cause for pause in this case, but you're still determining whether something was an objective intent to restrain by looking at it on the back end. What I'm saying is that, for example, if police officers were to put on some sort of blindfold and fire into a crowd with the intent to disperse them, it is to some extent outcome-based. If the bullets fly over the head of the crowd, no one has been seized. But if the bullets strike members of the crowd and they are injured and have to go to the hospital, they have been seized. So you would say that's by definition an unreasonable use of force? Excessive force? I would if someone is injured, yes. I am at my yellow light, and I only have less than two minutes. If you don't mind, I will reserve. I'll hold my last question for your rebuttal. Thank you, Your Honor. Good morning. May it please the Court. Tom Miller for the City of Seattle in this matter. Your Honors have keyed in on what is the key issue in this case, and frankly, the answers from counsel were more confounding and perhaps inaccurate in their statement of the law. As you correctly point out, what plaintiff has failed to show in this case is any objective intent to seize Mr. Chair's. All of the evidence here shows an intent to do quite the opposite. Blast balls are not impact munitions like 40mm sponge rounds or pepper balls, things that can incapacitate. Forgive me for interrupting. I just want to make sure we are keeping up. When you mentioned less than lethal munitions you just mentioned, you are calling our attention to Sanderlin, where we said that those were intended, designed to incapacitate. So I am understanding you to now be telling me that a blast ball is not designed to incapacitate. Is that right? The blast ball, correct. The blast ball is different. It is a sound and light device that is intended to basically scare the crowd in situations like this and cause them to move. And what that does is it... The record says sound, light, and chemical irritant. Do I understand that correctly? It can be chemical irritant if it's got a payload of OC inside. Some of them are inert. And on this occasion, what was he deploying? I believe it was OC. Right. So it's sound, light, and chemical irritant, right? Correct. Okay. Go right ahead. I didn't mean to interrupt. I just want to make sure we got the record straight. Which is also intended to disperse, right? Correct. Right. If we are going to start using tear gas. Excuse me, Judge Talmadge. I didn't mean to interrupt. Your point was that it's intended to disperse the gas. Right. As opposed to other types of less than lethal munitions that like skip rounds, that disperse shrapnel. Correct. The blast ball, as Lieutenant Brooks explained, it separates into two hemispheres of rubber. It does not emit, you know, SPD doesn't use the stinger blast balls, which has little balls inside that shoot out in all directions. They were never using those. But what do we do with the fact that, you know, we are looking at objective use of force? And as I said, in this particular fact pattern, I don't know that I've seen one like it, where this officer does basically the same thing four times. And one time, we have an internal report that indicates that it was because of, in part, because it was thrown overhead, which is disfavored, but not prohibited. And the result was, as you know, someone was struck in the chest and I think had a cardiac incident. And I think that internal report indicates that that was excessive force. Is that right? It didn't say that it was excessive force. It just found that it was not within policy for deploying blast balls because the officer... Is that the extent of that finding? That's my recollection from the record. Okay. I have a little bit different recollection, but just bear with me if you would. Because that's the problem for me. We can check the record and see exactly what they said. But the officer did do the same thing on this occasion, right? Overhead use of blast ball. We can talk about whether it was unreasonable use of force, but I think the question Judge Tallman posed about whether or not this is a seizure is very tricky in this case. It is and it isn't. And what's different? Well, let me first address the OPA, which is the Office of Professional Accountability's finding with respect to the fourth blast ball deployment, which as you referenced is the one that struck the woman. The fourth? I believe so. Okay. The reason for that finding was that Officer Anderson, who deployed it, couldn't recall and therefore couldn't articulate why he deployed that blast ball. As opposed to in this case, he recalled and he was looking at the video in his OPA interview that just before he deployed this blast ball, a glass bottle landed on the ground right in his vicinity. He deployed this blast ball to open space and we demonstrated through the video from Mr. Neal, which I believe is at docket 12, that the blast ball bounced and then skipped right and that's how it struck Mr. Chares. He was never the intended target. Was there an intended target? I didn't understand that there was an intended target. There wasn't one. And that's the point and that gets to your second question about Torres where there's got to be a manifest intent to seize and restrain movement. Yes, but it wouldn't be the rule. It's certainly not the rule that an officer would be free to just shoot into a crowd and say, I wasn't aiming at anyone in particular. You're not suggesting that? Not at all. Right. So when we go back to this, what should we do about the fact that we have the same objective action and we can't, unless you're going to tell me that we should be looking at the back end consequences, which seems to me counterintuitive given what the Supreme Court told us in Torres, right? Right. So what I think you're, you're asking us to rely upon the fact that this particular, unlike Sanderlund, that this particular less than lethal munition is one that is not designed or intended to incapacitate, but is intended to, with light, sound and chemical munitions, move a crowd, not restrain a crowd. Correct. And that is the key function of these blast balls. And it is when they are used is when line officers are being overwhelmed. They're being assaulted with rocks, bottles, fireworks, projectiles, improvised explosive devices, which is what we had on this evening. Could I ask you, I know I keep interrupting, forgive me, but I have a very detailed timeline. I think we all do. As of the time 1205, when this blast ball was deployed, there had been a report that violence had escalated pretty significantly. Somebody had been shot. Somebody had driven into the crowd. What I can't tell from the record that I have is whether Officer Anderson knew that. All things. That was broadcast over the radio. I can't direct you to a certain spot in the record where you can say, yes, he knew. Was he asked at that at his deposition? I can't see it. He wasn't deposed. I have a statement from him, I guess is what I'm reading. That's his OPA interview. He doesn't. OK, so that's an OPA interview. So he doesn't talk about having known those facts there. And there's no other place for me to look. Not that I'm aware of. OK, thank you. But it was generally known as broadcast. It's logged in the Spock log, which I believe is attached to Captain Allen's declaration. These officers are all wearing radios. They know what's going on. And that happened. The shooting happened earlier in the evening where a driver shot a protester. That was at about 8.20 p.m. And yet so this is, as Judge Talman pointed out, the very definition of a tense, uncertain and rapidly evolving situation. Officers are under routine and repeated barrage for hours and hours and hours as these protesters defy the lawful dispersal order that was given at 12 or 4 a.m. And what we showed through our materials was that despite those orders, which can be heard on Mr. Chair's own video, he remained there for a number of minutes rather than dispersing as ordered, as did the large majority of the crowd, which is why the blast balls were deployed. So we do not have a seizure here, unlike in, well, as I've talked about already, these blast balls are intended to disperse. They're not intended to apprehend, unlike a bullet, even a pepper ball, a 40 millimeter projectile, which are all pain compliance tools that cause the person to stop what they're doing and remain in place. What's the best record site for something that tells us that these were designed for that purpose? So that would be the comparable record site to the Sanderlund holding? It would be in Lieutenant Brooks's declaration and also the declaration of our expert, Travis Norton, both of which are in the record, obviously. I've seen those. I just wondered if there was something from the manufacturer. Travis Norton. Correct. Counsel, I have a question for you. Yes, Your Honor. What, when this kind of device is lobbed into a crowd, is the officer's intent to stop the movement of the crowd, stop the crowd from moving forward? It's to, it's not to stop the movement of the crowd. It's to get the crowd moving away from the line officers, which serves two functions. One, it creates time distance and shielding. The further away the crowd is, the less chance there is that they can do immediate harm to the officers. But it also prevents them, if they're moving, they can't then continue with assaults. If, you know, obviously if they're running, they can't drop their backpack, pull out a rock and throw it at the officers. So it serves both of those functions. And the crowd had breached the police barriers that had been erected around the precinct, had it not? They'd taken down the fencing. Right. Which was, the precinct's at 12th and Pike, and this occurred, or at Pine, and this occurred at 11th and Pine, right? Right. So a block, they're within a block of the police precinct. They were. And there were threats, there were credible threats of protesters threatening to burn down the East Precinct, which was obviously a huge concern. This was more than just a few, you know, malcontents lobbing a plastic water bottle or something at officers. This was far more dangerous and destructive that required immediate police response to cease these kinds of attacks. And the incident commander, I think, was he deposed, the captain? No. Do we have a statement from him? Captain Allen gave a declaration which attached his written narrative of that evening's events. And his concern was that he was trying to, the crowd was advancing on his, the line of officers and towards the precinct, and he was trying to get the crowd to move back and away. It was certainly one of the concerns, in addition to the projectiles, correct. Yeah. So we have a second claim here, in addition to excessive force, which is First Amendment retaliation. Our circuit is, well, I think every circuit has addressed the issues, has held that citizens have a right to be present, to film police officers performing official duties. And I don't see anything in the record here that indicates that Mr. Churchill was part of that protest. He was off to the side on the sidewalk and filming it, right, just to be clear. So he's brought a First Amendment retaliation claim. And I take it the city's response is that he ignored a dispersal order, right, that cautioned him about the use of these munitions. And so, but on the retaliation claim, I think your argument is slightly different, that there was not an intent to aim for him? Correct. Well, there's two arguments. One, you're correct, there was a lawful dispersal order. It was therefore a crime to remain. So he didn't have a First Amendment right to remain there and film. Well, it sort of depends, because he, you know, that dispersal order is within one minute, and it's captured on his iPhone, I think, the video that he was, you can hear it, and he says he didn't hear it. And I can imagine, if you would, just in a, think of a hypothetical situation where there's a melee and a lot of chaos. So I'm going to set that aside for a minute and ask you, in that hypothetical circumstance, wouldn't he have another problem with his First Amendment claim? Huge, which is the absolute absence of any evidence of retaliatory intent. In other words, there's no evidence in this record that the reason that any munitions were deployed, let alone deployed at him, which they weren't, was because of some act that he was engaging in, in terms of a protected speech. He, by his own concession and his deposition, Mr. Chair, has conceded he wasn't there to convey any First Amendment message, and there's certainly no evidence of any retaliation. He doesn't have to be there to convey a First Amendment message. Under our case law, filming is a First Amendment protected right. That's correct. Filming a public event. So, so he wouldn't have to have that. But I think what he would have to have is to be able to show that there was an intent to silence him. In other words, that he was, that they were perhaps aiming at him because he was exercising his First Amendment right. Right. And there's no evidence that Officer Anderson or any other officers deployed any of their less lethal munitions because of people filming or exercising any sort of free speech activity. So the claim fails on that front, and it also, we also have to be mindful that this is a Monell claim that plaintiff has brought. This is a municipal liability claim. There are no claims against the individual officers. And as Judge King held, obviously, absent a constitutional violation, there's no Monell liability. And then moving past that, we don't have unconstitutional customer policy. I'm happy to entertain any other questions that the panel may have. Yeah, I don't. Nothing. Thank you. They will thank you, Counsel. Thank you for your time. Okay. So we have some rebuttal. Thank you. So my question was, how would you square your argument with the Supreme Court's decision in Lewis versus the County of Sacramento? That was the case involving the high-speed chase of the fleeing motorcyclist and the police officer nudged the back wheel of the motorcycle. The passenger was ejected, seriously injured, and the Supreme Court said there's no Section 1983 liability for that. Was that based on the seizure ruling? I don't think it goes that far. But your argument, as I understand it, would result in a complete reversal of what the Supreme Court decided in Lewis. Well, I'm not here arguing for a reversal of a Lewis case. But obviously— Pride that. It doesn't work for me. Obviously, the facts are different. You've got an automobile engaged in active criminality, and the police are responding to, you know, an eluding automobile. You don't think that some of the people in this crowd were engaged in an ongoing act of crime? Well, some were. That's what I want to—I really want to end with this. The Constitution requires that when police use significant force, there's some sort of particularized assessment and evaluation of the threat posed by the person who the force is targeted at, the person who's ultimately injured. Cheers wasn't around when all this happened at the protest. All of the facts they're relying on to justify the officer's, you know, deployment of grenades, he wasn't even there. And the video is very clear. He wasn't engaging in any of the activities that the officers complain of or use to justify their— But the record shows that these acts were ongoing all night long. But can that be—can that then remove constitutional protection from someone in that crowd who's not engaged in criminality, and who was not even there when the criminality was occurring, and who the video very clearly shows was on the sidewalk. He was not directing any aggressive behavior towards the police. He didn't engage in any criminality whatsoever. But then if that's the case, then how can you argue that there was an intent to restrain him by using these munitions? Because if the police do not make a particularized assessment of the threat of a person— In the middle of a crowd of rioters, where the people who are throwing the projectiles are essentially using the cover of the crowd as a blanket, if you will, to protect them. Even in a circumstance like that, that is admittedly very difficult and challenging for the police to deal with and respond to. And very difficult for a court to write an opinion on what can and cannot be done under those circumstances. But it can't be a constitution-free zone. Even if they want to take steps to disperse the crowd, they want to take steps to arrest certain of the people in the crowd— In the face of somebody who doesn't obey the dispersal order and immediately remove themselves from the danger. Well, as Judge Christin pointed out, that dispersal order was given very shortly before this happened. But it is captured on his own video. And so I engage in this hypothetical about—assume that didn't happen, but you did just make a comment that he hadn't violated any law. And opposing counsel argues, well, he violated a dispersal order. So what do we do with that? And this dispersal order, by the way, unlike the Davis case, where they didn't tell the students how to leave, you know, and they were sort of gridlocked before they started firing those munitions. In this recording, we can hear the officers telling people, disperse, and you can do that by going this route or that route, or here's the way out. So what about that record? A dispersal order given by the police does not generate a constitution-free zone in the area where the dispersal order was given. You don't have a constitutional right to disobey a dispersal order, counsel. That's the conundrum we're in here. Well, again, I would submit to you, one, Mr. Cheers really didn't do anything wrong. It's not his fault that he was assaulted. Comply with the dispersal order. Secondly, he hasn't been charged with failure to disperse. You don't have to be, in terms of the—from the standpoint of the officers, as to when it's time to employ force. Well, again, a dispersal order does not generate a constitution-free zone. Even then, progressing to a use of force to try to disperse that crowd— Your argument is becoming circular. I'm not sure we're going to resolve it by going back and forth on this one. But I just think it's important to remember— We understand your argument. Even when there might be some justification for a use of force or for an arrest, the police are still bound to honor the Constitution in how they use force and in metering the force they use. It specifically says we look at reasonableness, right? And I submit to lob exploding flashbang grenades without looking where you're throwing them, without visualizing who you're hitting— What if they'd use a fire hose? I think that probably a similar analysis would apply. It's a slightly different use of force than a blast ball. Well, you get hit in the chest with a three-inch hose line, and you're going to go down. I think the same analysis would, in general— I'd hit your head on the sidewalk as you're falling. That's right. That's right. I mean, it's dangerous. And that's why—ultimately, it's why OPA sanctioned the officer. And ultimately, it's why I would encourage you to not— OPA recommended it. Did the chief impose a sanction on the officer? I believe so. Yeah. He appealed, and I don't believe his appeal was successful. Right. You know, lobbing grenades into a crowd without watching where you're lobbing them, and somebody—two people—are seriously injured, neither of whom was apparently engaged in anything other than being present. In violation of the dispersal order. Where the officer didn't even know he had hit anyone. The Constitution has to offer a remedy for people injured in that situation. You have a heck of a negligence claim. The question is, do you have a constitutional violation? Okay. Counsel, let me just comment. I think you're—I see the red light. Yes. You're now about five minutes beyond your time, but, of course, it's proper for you to answer fully to any questions. Let me ask my colleagues, Judge Tom or Judge Kristen, if they have any further questions. If not, then we should bring the argument to a close. And I very much thank the court for the accommodation on time. I appreciate that. Thank you. Thank you very much, counsel. Thank you both. This case shall be submitted.
judges: GOULD, TALLMAN, CHRISTEN